**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES-GENERAL**

Case No.: **CV 20-3056-JAK (PLAx)**                                    Date: **July 8, 2021**

Title:   **Southern California Housing Rights Center, Inc. v. TPG (Metropolitan), LLC, et al.**

-------------------------------------------------------------------------------------------------------

**PRESENT: THE HONORABLE   PAUL L. ABRAMS**
**UNITED STATES MAGISTRATE JUDGE**

| Christianna Howard | N/A | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

**ATTORNEYS PRESENT FOR PLAINTIFF(S):**          **ATTORNEYS PRESENT FOR DEFENDANT(S):**
NONE                                                                                      NONE

**PROCEEDINGS:  (IN CHAMBERS)   Plaintiff's Motion to Compel Further Discovery Responses and**
**Production of Documents (ECF No. 51)**

On June 23, 2021, the parties in this action filed a Joint Stipulation (alternatively "JS" (ECF No. 52)) in support of their positions regarding the Motion to Compel ("Motion" or "Mot." (ECF No. 51)) filed by plaintiff Southern California Housing Rights Center, Inc. ("plaintiff" or "HRC"), seeking to compel defendants TPG (Metropolitan), LLC ("TPG") and Pomona Park & Plaza LLC ("Pomona Park") (collectively "defendants"), to: (1) provide further responses and documents from defendants in response to plaintiff's Requests for Production ("RFP") numbers 2-4, 7, 9, 11, 13, 15-17, 19-21, 26, 32-35, 37-40, 42-44, 46-49, and 53; (2) provide further responses and production from TPG in response to plaintiff's RFP numbers 56-57, and 60-64; (3) provide further responses and production from Pomona Park in response to plaintiff's RFP numbers 56 and 57[1]; and (4) provide further answers from TPG in response to plaintiff's Interrogatory numbers 15 and 16.  (JS at ii).  Plaintiff also submitted the Declaration of its counsel Christopher Brancart ("Brancart Decl.") along with exhibits; defendants submitted the Declaration of their counsel Stephen Farkas ("Farkas Decl.") along with exhibits.  (ECF Nos. 53, 54).  On June 30, 2021, the parties filed their Supplemental Memoranda ("Supp'l Mem.").  (ECF Nos. 55, 56). Having considered the pleadings submitted in connection with the Motion, the Court has concluded that oral argument will not be of material assistance in determining the Motion.  Accordingly, the hearing scheduled for July 14, 2021, is **ordered off calendar**.  See Local Rule 7-15.

By way of background, plaintiff contends that defendants have committed a "continual decades-long pattern or practice of housing discrimination" in violation of the Fair Housing Act" ("FHA"), and discrimination based on familial status, race, and age in violation of California's Fair Employment & Housing Act ("FEHA").  (JS at 1; see also First Am. Compl. ("FAC") (ECF No. 35) ¶ 2).  Specifically, plaintiff contends that defendants "systemically displaced tenants based on age, familial status, and race at a large 432-unit apartment complex in

---

[1]   Although virtually identical RFP numbers 56 and 57 were served on each defendant, defendant Pomona Park responded that it was unable to comply with the requests because "the documents have been lost, stolen or destroyed," while defendant TPG responded that it was unable to comply because "due to the passage of time, the documents are no longer in its possession, custody or control."  (JS at 31, 32).

Pomona, the 777 Place Apartments" (the "Property").  (JS at 1).  According to plaintiff, defendants' principal, Kenneth Picerne, entered into an affordable housing agreement with the City of Pomona ("City") in 1996.  (Id.). The City gave Picerne "funding and property rights in exchange for Picerne's promise to fix up the apartments, manage[] them in accordance with fair housing laws, and to set aside 64% of the units as affordable housing for very low income (20%) and low and moderate income (44%) tenants, including senior housing units."  (Id.). Plaintiff asserts that "at least since 2009, Picerne has consistently violated the terms of that pledge while committing a pattern or practice of housing discrimination."  (Id.).

Defendants respond that the "affordable housing agreement" was entered into in 1996 and, while "certain terms of that agreement were incorporated into [the Property's] Conditions, Covenants and Restrictions ('CC&Rs'), the underlying bonds serving as the consideration for that agreement were satisfied in 2009."  (Id. at 2). Defendants assert that upon the Bond's satisfaction, "the only relevant restrictions on the Property's use were the CC&Rs."  (Id.).

The discovery cut-off in this action is September 20, 2021.

**Legal Standard**

The Court will examine the issues in the Motion using the general standard set forth in Federal Rule of Civil Procedure 26 ("Rule 26").  Rule 26 provides that a party may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]"  Fed. R. Civ. P. 26(b)(1).  Factors to consider include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Id.  Information need not be admissible in evidence to be discoverable.  Id.  However, a court "must limit the frequency or extent of discovery otherwise allowed by [the Federal] rules" if "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)."  Fed. R. Civ. P. 26(b)(2)(C).  Finally, the Court is mindful of the imperative that the Federal Rules of Civil Procedure be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1 (emphasis added); see also Landis v. N. Am. Co., 299 U.S. 248, 254-55, 57 S. Ct. 163, 81 L. Ed. 153 (1936) (a court has the inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants" and "[h]ow this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance").

Relevance "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978) (citing Hickman v. Taylor, 329 U.S. 495, 501, 67 S. Ct. 385, 91 L. Ed. 451 (1947)).  Even so, the scope of discovery is not without limits as Rule 26(b) (as amended in 2015) now provides that discovery is limited to information that is relevant to a claim or defense in the lawsuit *and* proportional to the needs of the case.  The party seeking to compel discovery "has the initial burden of demonstrating relevance" under Rule 26.  See Integon Preferred Ins. Co. v. Saavedra, 2019 WL 4228372, at *2 (C.D. Cal. July 12, 2019) (citations omitted).  Thereafter, "[t]he party who resists discovery has the burden to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections."  Duran v. Cisco Sys., Inc., 258 F.R.D. 375, 378 (C.D. Cal. 2009) (citing Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975); Sullivan v. Prudential Ins. Co. of Am., 233 F.R.D. 573, 575 (C.D. Cal.

2005)).

## The Discovery in Dispute

The parties organize the subject discovery into four categories:  (1) discovery seeking information regarding the relationship among defendants and their principals, successors, and agents and between defendants and the subject rental dwellings (RFP numbers[2] 2-4, 7, 9, 11, 13, 15-17, 19-21); (2) discovery seeking information regarding defendants' alleged displacement of tenants at the Property (RFP numbers 32-35, 37-40, 47, 53, 56-57, 60); (3) discovery seeking information regarding defendants' rental criteria, rental policies, and compliance with affordable housing covenants (RFP numbers 48-49, 61-64 (TPG only); Interrogatory numbers 15-16 (TPG only)); and (4) discovery seeking information regarding the marketing of rental dwellings at the Property (RFP numbers 26, 42-44, 46).  (JS at 1-2).

## Information Regarding the Relationship Between Defendants and Other Picerne Entities (RFP Nos. 2-4, 7, 9, 11, 13, 15-17, 19-21)

These requests seek information regarding the relationship among defendants and their principals, successors, and agents, and between defendants and the subject Property.  (Id. at 3).

Plaintiff contends that these requests are relevant and proportional to the needs of the case because determining who controlled the Property, and "when that control was exercised . . . is relevant to determining who may be liable for the discriminatory housing practices alleged by HRC."  (Id. at 21).  Plaintiff notes that in order to make this determination, it needs access to information regarding the relationship among the "Picerne entities listed in each request and their relationship"[3] to the Property.  (Id. at 21-22).  It also asserts that the information is necessary to explain the history of the Property and defendants' role in that history to the jury, and is relevant and proportional to plaintiff's need to discover the identity of persons with knowledge about the operation of the Property.  (Id. at 22).  Plaintiff also notes that information regarding other rental dwellings owned or operated by the Picerne Entities in Pomona is relevant to defendants' intention "to acquire and manage several Pomona apartment building[s], comprising 722 dwellings, not just the 472-units" at the Property, but states that this is probably a "non-issue," as defendants represented in a November 4, 2020, letter to plaintiff that "there are no other rental dwellings owned by the Picerne Group, Picerne Management Company, or Picerne Associates in the City of Pomona," and "indicated that they would supplement their discovery responses to that effect."  (Id. at 22-23).  Plaintiff concludes, therefore, that defendants "can therefore resolve this issue by simply supplementing as they promised."  (Id. at 23).

Among other things, defendants respond that Picerne Associates was dissolved in 2003, Picerne Management Company was dissolved in 2004, and The Picerne Group does not hold title to any property.  (Id. at 23-24).  They argue that the Property was "owned and developed by defendant Pomona Park from 1996 through 2014," and "[i]n 2012, Pomona Park changed its name to TPG (Metropolitan) LLC."  (Id.).  Because Picerne Management and Picerne Associates were dissolved almost "two decades ago," defendants argue that discovery

---

[2]    The virtually identical requests (sometimes with minor differences, e.g., differing dates for which documents were being sought) were served on both defendants unless otherwise indicated.

[3]    In addition to TPG and Pomona Park, the Picerne entities include Picerne Associates, Picerne Management Company, and The Picerne Group (the latter three collectively "Picerne Entities").  (JS at 4).

relating to those entities would be unduly burdensome and disproportionate to the needs of the case.  (Id.).
Defendants further state that they served their responses to these requests over ten months ago -- in September
2020 -- and, since that date, they have also opened their tenant records for inspection at the Property, responded
to numerous additional sets of written discovery, and proceeded with depositions.  (Id. at 25).  Defendants note
that "since receiving Defendants' [November 4, 2020,] follow up letter regarding the Parties' September 25th
discovery conference . . . Plaintiff has not pursued these specific requests at all."  (Id.).  They assert that due to
plaintiff's ten-month delay without any further discussion between the parties, plaintiff "should be deemed to
have waived the issue."  (Id.).  Defendants also submit that plaintiff's Motion with respect to these requests
should be denied not only because of plaintiff's lack of diligence, but also in light of defendants' agreement to
supplement their discovery responses to indicate that no other properties in the City are owned by the Picerne
Entities.  (Id. at 24).

Plaintiff replies that the information being sought is relevant and proportional to the needs of the case as it seeks
to identify persons and entities with knowledge about the operations and history of the Property and the Picerne
Entities' relationship with the named defendants -- topics it asserts are directly related to the case.  (Pl.s' Supp'l
Mem. at 1).  It also argues that the requests are not unduly burdensome or disproportionate to the needs of the
case.  (Id.).  It states that even if the Picerne Entities have been dissolved, plaintiff is seeking to "merely
discover records *regarding* dissolved corporations, and not even sue them directly."  (Id.).  Plaintiff also
contends that it has not waived its right to raise the issue here as there was no undue delay in this case -- indeed,
it "chose to defer and file a single, comprehensive motion covering all of the discovery issues," and to submit
it well before the September 20, 2021, discovery cut-off date.  (Id. at 1-2).

In their Supplemental Memoranda, defendants represent that they are in the process of supplementing their
responses to RFP numbers 2-4, [7,][4] 9, 11, 13, 15-17, and 19-21 "to indicate that the Picerne Group, Picerne
Associates, LLP, and Picerne Management Inc. do not own property in the City."  (Def'ts' Supp'l Mem. at 1).
They also state that they were "unaware additional issues remained as to these requests until receiving"
plaintiff's portions of the Joint Stipulation, and anticipate serving their supplemental responses "significantly
in advance of the hearing" on the Motion.  (Id. (citing Farkas Decl. ¶ 12)).

Although somewhat unclear, it appears that defendants have not only agreed to supplement their responses to
reflect that the Picerne Entities do not own property in the City, but will also supplement with respect to the
"additional issues" raised by plaintiff with respect to these requests, i.e., by providing documents that explain
the history of the Property and defendants' role in that history, the identity of persons with knowledge about the
operation of the Property, and documents about the Picerne Entities' relationship with the named defendants.

The Court determines that notwithstanding the passage of time, plaintiff has not waived these issues.
Additionally, to the extent the requests seek information relating to the Picerne Entities' relationship to the
Property (if any), they are relevant and proportional to the needs of the case as they may help determine liability
for the discriminatory housing practices alleged by plaintiff, may provide background information on the history
of the Property and defendants' and the Picerne Entities role' (if any) in that history, and may provide the
identity of persons with knowledge about the operations of the Property.  Such information is also proportional
to the needs of the case, as limited below.

---

[4]    Although defendants did not include RFP number 7 in the list of responses they represent that they
intend to supplement (see Def'ts' Supp'l Mem. at 1), the Court assumes this was an oversight and includes it in
this Order.

Plaintiff's Motion is **granted** with respect to RFP numbers 2, 3, 4, 7, 9, 11, 13, 15, 16, 17, 19, 20, and 21.  **No later than July 29, 2021**, defendants shall provide supplemental responses and responsive documents in their possession, custody, or control reflecting (1) that the Picerne Entities do not own property in the City (as defendants have represented), and (2) the Picerne Entities' involvement, if any, with the Property from 2009 to the present.

**Information Regarding the Marketing of the Property (RFP Nos. 26, 42-44, 46)**

These requests seek information regarding defendants' "prolonged campaign to market rental dwellings at the [Property] to university students in contrast to their obligations to market them to low-income persons in need of affordable housing." (JS at 82).  Plaintiff states that the factual basis for this discovery is provided by three things:  (1) public records, including the 1996 Owner Participation Agreement ("OPA") entered into between Picerne and the City; (2) documents publicly available on the website for the Property, which reflect that since 2014 defendants have marketed and advertised the Property primarily to students, "rather than to senior citizens, handicapped persons, or persons in need of affordable housing"; and (3) documents produced via subpoena by Greystar, including emails suggesting that defendants are "intimately involved in the marketing decision making process." (Id. at 89-90 (citations omitted)).  Plaintiff suggests that if Greystar has such documents, "defendants must have them as well, and for a greater time than Greystar has access to." (Id. at 90).

Plaintiff argues that the requested materials are directly relevant to plaintiff's fair housing claims, "as plaintiff alleges that defendants' discrimination was carried out in part through its marketing efforts." (Id. at 90-91 (citations omitted)).

Specifically, plaintiff notes that in response to RFP numbers 42-44, defendants stated that they will produce marketing documents in their possession, custody, or control, but have produced very few such documents, and "none of their email communications reflecting defendants' direction to their managers," despite promising at a Local Rule 37 conference to furnish documents from three sources:  (1) paper tenant files; (2) Entrata, their property management system, which is currently in the possession of Greystar[5]; and (3) documents in the possession of their management companies. (Id. at 91; see also Brancart Decl. ¶¶ 8, 9 & Ex. 9).

With respect to RFP numbers 26 and 46, defendants responded that the requested documents are not within their possession, custody, or control, or that the documents never existed. (JS at 92).  Plaintiff asserts that these statements "strain credulity" because for the last twenty-five years, defendants have been obligated to market the Property in accordance with all Affirmative Fair Housing guidelines and policies, and yet "now avow that any documents reflecting their compliance or non-compliance with that obligation 'never existed.'" (Id. (citing Brancart Decl. Ex. 24)).  Likewise, defendants have "stipulated in their management agreements" for at least the last twelve years that they have "sole discretion" to approve marketing materials, yet now state that documents "reflecting the email addresses used by the marketing decision makers 'are not within [their] possession, custody or control,'" which is "not plausible." (Id. (citation omitted)).

---

[5]     The Court notes that Exhibit 9 to the Brancart Declaration states that defendants had explained that Greystar controls or possesses the ESI and that defendants were "currently in discussions with Greystar to obtain the release of that ESI for production to HRC in response to its requests for production." (Brancart Decl. Ex. 9).  In his Declaration, Mr. Brancart states that defendants "honored their agreement to make paper tenant files and certain Entrata [year-end] paper printouts available for copying." (Brancart Decl. ¶ 9).  He also states, however, that defendants "have never produced a set of the ESI stored in any property management system, including Entrata, reflecting the tenancy data of persons who occupy dwellings" at the Property. (Id.).

Defendants respond that these requests all seek documents related to defendants' marketing, and that they, as well as their third-party managers, "have all produced marketing plans, communications and exemplars of the marketing materials in use at the Property." (Id.). They assert that the "day-to-day marketing was performed by the local representatives and managers," that defendants were provided with general marketing plans for approval, which have been produced, and that information relating to the formulation and execution of the marketing strategies "would have been primarily within the possession of the third party managers." (Id. at 92-93). Defendants contend, therefore, that their responses to these requests "correctly indicate that responsive information would be in the possession of these managers," and that "[t]o the extent additional documents were located in the third-party managers' files is understandable and to be expected -- marketing was one of their express jobs." (Id.).

Specifically, with respect to RFP number 26 (seeking "identification of the individuals responsible for the Property's 'management, rental, or marketing'"), defendants state they have produced thousands of pages of records and identified witnesses in their disclosures related to the decision makers. (Id.). They claim that in light of the fact that many of the marketing decisions were "originally proposed by employees at the third-party management companies (and in many instances over a decade ago)," some responsive information is "simply no longer within Defendants' possession, custody or control" and their response that the information is in the possession of the property managers is accurate. (Id.).

With respect to RFP numbers 42-44 and 46 (seeking discovery on the Property's marketing), defendants note that they met and conferred with plaintiff on September 25, 2020, regarding these requests and "[i]mmediately after meeting and conferring with Defendants regarding their request that Defendants produce the information from the third-managers [sic], Plaintiff subpoenaed the information from each manager directly." (Id. at 93-94 (citing Farkas Decl. ¶ 10)). Defendants note that they are "surprised additional discovery is now being sought -- 10 months after the last communication on this issue," and in light of the facts that plaintiff obtained the information directly from each manager and never indicated further discovery was necessary, and that defendants produced all the tenant files on October 16, 2020. (Id. at 94). Defendants submit that "given that most of these managers are third-parties, it would be not only futile but oppressive to ask them to produce the same materials already subpoenaed by Plaintiff." (Id.).

In their Supplemental Memorandum, defendants reiterate that "given the passage of time," as well as the subpoenas plaintiff served on the property managers, they "did not believe this issue remained open." (Def'ts' Supp'l Mem. at 2). They represent, however, that they are "in the process of searching for additional marketing materials and intend to supplement their production." (Id.).

Although defendants contend that their third-party managers possess the "underlying information related to formulation and execution of the marketing strategies," the Court finds that defendants do not clearly state that they have conducted a diligent search and reasonable inquiry for any documents in their own possession, custody, or control related to marketing materials. For example, although the third-party managers have allegedly produced documents relating to the formulation and execution of marketing strategies, there is no indication that defendants ever searched their own records for documents or communications relating to the formulation or execution of those strategies, or, for example, relating to the approval process for those strategies. Such documents are relevant and proportional to the needs of the case.

Based on the foregoing, plaintiff's Motion is **granted** with respect to RFP numbers 26, 42, 43, 44, and 46. **No later than July 29, 2021**, defendants shall provide their supplemental responses and produce documents in their possession, custody, or control that are responsive to these requests, including ESI that has not previously been produced in another format, for the relevant time periods as stated in the requests, or since 2012 if not otherwise stated. Defendants are not required to ask their third party managers to again produce documents that have

already been produced.


**Defendants' Motion for Summary Adjudication**

Defendants state that RFP numbers 32-35, 37-40, 47-49, 53, 56-57, and 60-64 (TPG only), and Interrogatory numbers 15 and 16 (TPG only) "all seek documents or information related to Defendants' compliance with either a fully-satisfied regulatory bond agreement or the Property's CC&Rs." (Def'ts' Supp'l Mem. at 2). They contend that these discovery requests, therefore, are "based on allegations that are either barred by the statute of limitations or arise from the Property's CC&Rs under which Plaintiff lacks standing to litigate." (Id.). On June 23, 2021 -- the same day the Motion was filed -- defendants filed a Motion for Summary Adjudication ("MSA") to address these claims. (Id.; see also ECF No. 48 (MSA)). The hearing on the MSA is set for October 25, 2021 -- four months after filing it and a little more than a month *after* the discovery cut-off date of September 20, 2021. (MSA at 1).

Defendants assert that a favorable ruling on the MSA may moot the discovery targeted to these issues. (Def'ts' Supp'l Mem. at 2). They state that if this Motion is heard first, "the parties may be ordered to conduct costly discovery, expending valuable resources only to have the issues adjudicated as discrete questions of law." (Id.). Although defendants asked plaintiff to stipulate to continue the hearing on the discovery motion until after the District Judge has ruled on the MSA, the parties were unable to reach an agreement. (Id.). Defendants state that they "anticipate filing an *ex parte* application to address the timing issues presented by these related motions" and that any attempt to compel further discovery related to these requests "is premature." (Id.).

On July 7, 2021, the Court denied defendants' July 6, 2021, Ex Parte Application seeking to continue the hearing on plaintiff's Motion to after the hearing on defendants' MSA, noting -- among other things -- that the Court examined these requests using the general standard set forth in Rule 26, and separately from the statute of limitations and standing issues.


**Information Regarding Displacement of Tenants (RFP Nos. 32-35, 37-40, 47, 53, 56-57, 60 (TPG Only))**

Plaintiff alleges in its FAC that defendants "systemically displaced tenants based on age (elderly tenants), then based on familial status (minor children), and finally based on source of income (Section 8 recipients)." (JS at 25 (citing FAC ¶¶ 26-33)). Plaintiff states that these requests seek information "regarding TPG's avowal of these alleged preferences," and "the tenants to whom these alleged preferences applied." (Id. at 26). Plaintiff states that there are three sources that "provide the factual basis for this discovery and the underlying allegations in HRC's" FAC: (1) complaints received by HRC from tenants who reported they were ordered to vacate their homes by defendants or their managers; (2) public records produced by the City showing that within a twelve-month period "Picerne evicted every tenant from [the Property] whose rent was subsidized under the Section 8 program"; and (3) marketing plans provided by two of the four management companies hired by defendants to run the Property since 2010: (a) defendant Asset Campus created a marketing plan in 2016 that promised to achieve a student demographic at the Property; and (b) Greystar created a marketing plan in 2020 that acknowledged "Picerne's past student marketing efforts, sorted households based on student status, and promised in a series of recommendations to invest more in student marketing in order to increase by 20% the number of student-occupied dwellings" at the Property within one year. (Id. at 38-40 (citations omitted)).

Plaintiff deems defendants' responses to RFP numbers 37-40 and 47 to be "inadequate," and their responses to RFP numbers 32-35, 53, 56-67, and 60 (TPG only) to be "incredible." (Id. at 40). Plaintiff acknowledges that in response to RFP numbers 37-40 and 47, defendants made their physical tenant files available, which plaintiff

inspected and designated for copying on October 16, 2020. (Id.). The copy service produced the designated records to defendants, "who reviewed them for privilege, Bates stamped them, and produced them to HRC on January 19, 2021." (Id. at 40-41 (citing Brancart Decl. ¶ 9)). However, plaintiff complains that defendants have not produced any electronically stored information ("ESI") from their property management system Entrata, as requested in RFP numbers 37-40, despite promising to do so during a September 18, 2020, Local Rule 37 conference. (Id. at 41 (citing Brancart Decl. ¶¶ 8, 9 & Ex. 9)). Additionally, it asserts that defendants have not produced any documents about unit upgrades and remodeling as requested by RFP number 47. (Id.). Plaintiff also argues that in response to RFP numbers 32-35 (seeking documents indicating a preference or limitation based on Section 8, student, age, and familial status), "defendants simply assert that the 'requested documents never existed'" and, that in response to RFP numbers 53 and 56-57 (seeking documents regarding internal decision-making about student and Section 8 tenants), "Pomona Park simply asserts that 'the documents have been lost, stolen or destroyed.'" (Id. at 40-41).

Plaintiff contends that the information being requested in this discovery is relevant and proportional to the action for several reasons. (Id. at 41). First, it alleges the information is "directly relevant to the question of whether defendants committed . . . discriminatory housing practices," such as by evicting existing tenants based on` age, familial status, and race. (Id.). According to plaintiff, defendants disclaim discrimination and state that during remodels, existing tenants were "offered a multitude of options ranging from early termination of their leases to relocation," and remodeling decisions were made based on "legitimate market factors and not targeted towards any specific subset of tenants." (Id. at 42). Plaintiff claims that request number 47 specifically seeks information to test the validity of this defense and defendants' production of tenant files does not address this issue. (Id.). Plaintiff surmises that with respect to the information sought by RFP numbers 37-40, "additional responsive records in the control of the various Picerne Entities should also exist, which would not be captured in the tenant files" but may be stored in the ESI on defendants' property management system, Entrata. (Id. at 42-43). Plaintiff states, however, that defendants "have reneged on their agreement to produce that ESI." (Id. at 43).

Plaintiff also notes that request numbers 32-35, 53, 56-57, and 60 seek information to show that defendants had rental preferences on the basis of age, familial status, student status, and Section 8 status, and explains that although its pleaded claims are limited to discrimination on the basis of age, familial status, and race, defendants' decision to evict every Section 8 tenant from the Property and to increase the proportion of student renters "is highly relevant to HRC's fair housing claims of race, familial status, and age discrimination." (Id.). Plaintiff also contends that between October 2013 and September 2014, defendants evicted every Section 8 household from the Property (id. at 39-40), and defendants' decision to refuse to rent to future Section 8 tenants, and to evict existing Section 8 tenants "is relevant evidence of discrimination on the basis of race, age, and familial status, since Section 8 tenants are disproportionately elderly, black, and low-income families with children." (Id. at 43-44 (citations omitted)). It states that the evidence also goes to the weight to be given plaintiff's theory of disparate treatment, i.e., that defendants' policy to displace existing Section 8 tenants and to refuse to rent to new Section 8 renters "had a disparate impact on Blacks, seniors, and families with children." (Id. at 44; Pl.'s Supp'l Mem. at 2-3). Plaintiff further contends that its claims related to the displacement of Section 8 tenants are timely "because they are part of a continuing systemic policy or practice of preferring students." (Pl.'s Supp'l Mem. at 3 (citations omitted)).

Plaintiff submits that defendants' assertions that responsive documents reflecting that defendants' preference or limitation with respect to rental based on Section 8 or student status "never existed" or "have been lost, stolen or destroyed" is "incredible." (JS at 44-45). It notes that the evidence shows that defendants clearly had a preference for student renters, and "[a]s with Section 8 status, student status is not covered by either the FHA or FEHA." (Id. at 45). According to plaintiff, a "practice to prefer students comes freighted with the same evidentiary implications as a decision to eject all Section 8 households," and "portends a profound exclusion of renters on the basis of race (black), familial status (minor children), and age (elderly)" when taking into

consideration the demographic makeup of students at the nearby Western University, Cal Poly /Pomona, and Mt. San Antonio Community College.  (Id.).

Plaintiff contends that during the parties' January 6, 2021, Local Rule 37 conference, defendant Pomona Park agreed to search again for materials it had asserted may have been lost, stolen, or destroyed, and for additional material responsive to RFP number 60, but has "failed or refused to honor its agreement," and has provided no information, and no indication that it has conducted the agreed-upon searches.  (Id. at 45-46 (citing Brancart Decl. ¶¶ 12, 13)).  Additionally, because defendants have not produced any ESI from their property management system Entrata, their "claim that they have provided all responsive documents is unconvincing."  (Pl.'s Supp'l Mem. at 3).

Defendants respond that they have provided documents and code compliant responses to request numbers 32-35, 37-40, 47, 53, 56-57, and 60, and provided plaintiff access to every tenant file in defendants' possession, custody, or control.  (JS at 46-47).  They note that the discovery "seeks approximately 13 years' worth of records related to 472 separate units," and "in many instances some documents may not be available simply due to the passage of time."  (Id. at 46).  They assert that they reported the "last Section 8 tenancy" in 2014, and that "civil court actions under the FHA are subject to a two year statute of limitations, which begins to run on the date of the last occurrence of discrimination," and two years from the date of the alleged discriminatory act under FEHA.  (Id. at 47 (citations omitted)).  Thus, any claims arising under the Property's Section 8 program prior to 2019 is subject to dismissal and the "discovery on this issue is irrelevant."  (Id.).  They also argue that they were not required to accept Section 8 tenants after the redevelopment bonds were satisfied in 2009, until January 1, 2020, when California landlords were required to accept Section 8 or housing vouchers as an income source from applicants.  (Id. at 48 (citing Cal. Gov't Code §§ 12927, 12955)).  Again, therefore, defendants contend that discovery related to the displacement of Section 8 tenants in 2014 is irrelevant due to the statute of limitations, and disproportionate to the needs of the case.[6]

In any event, defendants generally contend that they have provided all documents responsive to these requests in their possession, custody, or control -- including the tenant files, and corporate records and communications.  (Id. at 49).

Specifically, with regard to request numbers 32-35 (seeking documents referencing a preference or limitation with respect to rental as to age, familial status, student status, or source of income), defendants assert that other than the marketing plans that were produced in response to other discovery requests, "there simply are no documents referencing an express policy of 'preference or limitation.'"  (Id.).

With regard to request numbers 56-57 (seeking documents relevant to any decision not to renew Section 8 tenancies between 2009 and 2014), defendants state that these decisions were based on a "series of renovations that were conducted at the Property in order to meet the changes occurring in the surrounding area due to both the City's efforts to revitalize its Historic Downtown District, as well as the adjacent medical school's ongoing expansion across the street" -- efforts that were "undertaken 7 to 11 years ago."  (Id. at 49-50).  As a result, some of the documents are no longer available, although all tenant files "were maintained and all of those files were provided to Plaintiff."  (Id. at 50).  Defendants also contend that "the statute of limitations has passed on any claims that may have been asserted as to these tenant displacements so the issue is moot."  (Id.).

---

[6]    This discovery Motion is not the proper vehicle for litigating the statute of limitation issue, which is the subject of defendants' MSA.

With regard to request numbers 37-40 and 47 (seeking information "either derived from, contained within, or the actual tenant records themselves"), defendants state that despite the extreme overbreadth of these requests -- which seek records for an eleven-year period between 2009 and 2020 -- they have "either produced or made available all files that remain in their possession, custody or control by opening their records for inspection and copying on October 16, 2020." (Id. (citing Farkas Decl. ¶ 9)). They assert that to the extent plaintiff appears to be demanding that these documents be made available in an alternative electronic format, the records are maintained in hard copy at the leasing office "in their usual course," and defendants, therefore, complied with Rule 34(b)(2)(E)(iii) by producing the files in hard copy. (Id.).

After reviewing the parties' arguments, the Court finds that although it may only be the City that has a cause of action for *enforcement* related to defendants' purported failure to comply with the CC&Rs, there is no indication that plaintiff is in any way seeking to enforce that compliance with this Motion. Instead, plaintiff is simply seeking the requested information to help it determine whether defendants' actions resulted in disparate treatment or disparate impact under plaintiff's FHA and FEHA claims. In that respect, the information is relevant and proportional to the needs of the case.

Plaintiff's Motion is **granted in part** and **denied in part** as follows:

Plaintiff's Motion with respect to RFP numbers 32-35 is **denied.** However, **no later than July 29, 2021**, each defendant shall provide a **declaration, signed under penalty of perjury by a corporate representative**, attesting, if true, that after a diligent search and reasonable inquiry there are no additional documents responsive to RFP numbers 32-35 in its possession, custody, or control, including, but not limited to, ESI that has not already been produced in another format, for the relevant time periods as stated in the requests, or since 2012 if not otherwise stated.

Plaintiff's Motion with respect to RFP numbers 37-40, 47, 56-57, and 60 (TPG only) is **granted in part**. **No later than July 29, 2021**, defendants shall provide their supplemental responses and produce documents in their possession, custody, or control that are responsive to these requests, including, but not limited to, ESI that has not already been produced in another format, for the relevant time periods as stated in the requests, or since 2012 if not otherwise stated. However, defendants are under no obligation to re-produce the tenant files in electronic format if the electronic files mirror the hard copies already provided to plaintiff for copying. If defendants contend that they have no additional responsive documents, each defendant shall provide a **declaration, signed under penalty of perjury by a corporate representative**, attesting, if true, that after a diligent search and reasonable inquiry there are no additional documents, including, but not limited to, ESI that has not already been produced in another format, responsive to RFP numbers 37-40, 47, 56-57, and/or 60 (TPG only) in its possession, custody, or control for the relevant time periods as stated in the requests, or since 2012 if not otherwise stated.

**Information Regarding Rental Criteria, Policies, and Compliance (RFP Nos. 48-49, 61-64 (TPG Only); Interrogatory Nos. 15-16 (TPG Only))**

Request numbers 48-49 seek information regarding compliance with affordable housing covenants; Interrogatory numbers 15-16 (served only on TPG) seek information regarding defendant TPG's understanding of the obligations conferred by those covenants; and request numbers 61-64 (served only on TPG) seek information regarding the source, nature, and implementation of rental criteria employed by defendants in relation to those covenants. (JS at 51).

Plaintiff contends that the factual basis for this discovery includes public records obtained from the City showing that Picerne failed or refused to report his compliance with the affordable housing covenants to the City in 2015 and 2016, and finally did so in 2019 "when the City threatened to sue Picerne unless [he] reported [his] compliance." (Id. at 69 (citations omitted)). It argues that the regulatory requirements imposed by the 1998 Amended and Restated Regulatory Agreement executed by Picerne, "mandated that Picerne collect and maintain specific income qualification information for each resident who qualified for affordable housing" and report that information to the City on a quarterly basis. (Id.). The 1998 housing bond, "whose proceeds the City lent to Picerne to refinance his acquisition of the [Property] on more favorable terms, explicitly extended these requirements until 2026," including, plaintiff argues, the requirements that at least 20% of the units be rented to very low income persons or families, 44% be rented to low and moderate income persons or families, and the remaining 36% "will have no occupancy or rent restrictions." (Id. (quoting Brancart Decl. Ex. 29, Attach. 1)). Plaintiff contends that the bond agreement also required that the "occupancy requirements are to be maintained for 30 years from and after the date of recording of the Declaration of Conditions, Covenants and Restrictions." (Id. (quoting Brancart Decl. Ex. 29, Attach. 1)).

Plaintiff notes that defendants assert they have maintained the appropriate proportions of low income tenants and are in compliance with all existing City, State, and Federal Requirements. (Id. at 70-71). It argues that if this is true, "then it would also be true that there would be communications, directions, and instructions from [defendants] to [their] management companies and employees regarding the duty to comply with these requirements." (Id.). Plaintiff further argues that it "would also be probable that there would be some records reflecting or acknowledging these duties by [defendants'] employees, principals, and investors, along with some discussion about how these duties were to be met." (Id. at 71). According to plaintiff, RFP numbers 48-49 seek those kinds of documents, but none has been produced and defendants instead point to the tenant files as the source of such information. (Id.). Plaintiff states that it has found no such income qualifications for income-restricted units in the hard copy tenant files, and suggests that those files "are not the place" where defendants would "store communications, directions, and instructions that it issued to its managers and employees about their duty to qualify tenants based on the HUD's low-income standard or about how they should implement and determine whether a rental applicant meets that standard." (Id.).

Plaintiff also argues that based on defendants' own records, "plaintiff knows for sure that defendants have indeed applied certain rental criteria during their operation of the [Property] and have targeted local university students as tenants." (Id. at 72). However, plaintiff states that none of defendants' documents "reflect how the defendants' rental criteria comport with their obligation to rent to low-income tenants . . . [n]or do any of them reflect any 'instructions, direction or guidance to onsite managers and their supervisors and reports, disclosures, or communications to LLC members, investors, or potential investors' regarding the application of these criteria, as requested in Request 49." (Id.).

In response to the discovery, defendants stated that additional documents may be within the possession of the third-party management companies employed to manage the Property during the relevant time frame. (Id.). Plaintiff observes that the management agreements between defendants and their third-party management companies provide that each management company would comply with standards established by the owner of the Property, on terms "based upon **criteria approved from time to time by Owner** and based upon Manager's recommendations"; plaintiff argues, therefore, that "Picerne, the owner of the [Property], should possess the documents that plaintiff seeks through this discovery." (Id. (emphasis in original) (quoting Brancart Decl. ¶ 35)).

Plaintiff states that information reflecting defendants' continuing duties to implement affordable housing to low-income tenants is relevant and proportional to plaintiff's efforts to prove its FHA and FEHA claims under disparate treatment and disparate impact theories. (Id. at 73). Under the disparate impact theory, plaintiff "must point to a practice [such as defendants' breach of its affordable housing obligations and its duty to qualify rental

applicants as low income] that generates a disparate impact based on race, age, or familial status." (Id.)  For instance, it alleges that a practice that "abrogates or disregards a qualification standard that favors low-income renters will disproportionately disfavor black renters." (Id.).  Under the disparate treatment theory, plaintiff intends to show that it will "resort to proving disparate treatment using circumstantial evidence, . . . directly using a mosaic of factors." (Id. at 74 (citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266-67 (1977))).  It asserts that evidence relating to defendants' pattern or practice of discrimination "includes the historical background related to defendants' obligation to provide affordable housing, the sequence of events leading to defendants' disregard of their affordable housing duties, and communications reflecting an understanding of the effect of defendants' decision to disregard their affordable housing duties." (Id. (citations omitted)).  It submits that given "[defendants'] repeated, recorded agreements to enforce affordable housing restriction, defendants' breach of those agreements may -- with other evidence -- support an inference of discriminatory intent." (Id.).

Plaintiff also states that if defendants contend that they are not bound by the restrictions established by the CC&Rs, "which form the basis of Request 48-49 and 61-64 [to TPG only]," then plaintiff needs to "know the facts supporting that contention," and Interrogatory numbers 15-16 (to TPG only) represent a "proportional approach to discovering that relevant information." (Id. at 75).

Defendants respond that plaintiff's causes of action under the FHA and FEHA do not provide "standing to litigate Defendants' compliance with the CC&Rs." (Id. at 76).  They also note that "given the allegation that Defendants' alleged discriminatory conduct arises from a purported preference for students, CC&R compliance is irrelevant." (Id.).  Thus, according to defendants, "Plaintiff's discovery request exceeds the bounds of proportionality." (Id.).

Specifically, defendants point out that the FHA's protected classes are limited to race, color, religion, sex, familial status, and national origin. (Id. at 77 (citing 42 U.S.C. § 3604)).  Thus, a person or family's income level is not a protected class under the FHA or FEHA and "no claim exists that Defendants are liable under the FHA (or FEHA) for failure to rent apartments to low income persons." (Id. (emphasis in original)).  Because any such claim would "stem from [defendants'] obligations as a result of the CC&Rs and related agreements with the City of Pomona and the Redevelopment Agency -- both nonparties . . . [--] HRC does not have standing to assert a claim regarding whether Defendants were in breach of the CC&R's income requirements and discovery targeted towards Defendants' compliance serves no purpose under the asserted causes of action." (Id.).

Defendants also argue that plaintiff's claims and discovery requests "confuse former affordable rent requirements applicable under the now-satisfied regulatory bond and existing occupancy requirements under the CC&Rs." (Id. at 78).  As such, defendants contend that plaintiff's "entire position on the discovery targeted towards Defendants' relationship with the City of Pomona suffers from the incorrect assumption that all of the requirements under the regulatory documents were imposed by the CC&Rs." (Id.).  They note that the CC&Rs were "significantly less restrictive than the underlying regulatory documents," which is "precisely the reason why Defendants opted to satisfy the bonds early." (Id.).  Defendants conclude that plaintiff lacks standing to enforce their compliance with the CC&Rs and former regulatory agreements.[7] (Id.).

Defendants further assert that their purported preference for student tenants "has nothing to do with Defendants' CC&R compliance," and is "completely removed from the types of acts either the FHA or FEHA were designed to oversee." (Id. at 79, 80).  Additionally, they contend that the subject discovery "seek[s] facts and documents

[7]    This discovery Motion is not the proper vehicle for litigating the standing issue, which is the subject of defendants' MSA.

related to Defendants' interactions with the City of Pomona," and such information "is patently irrelevant to Plaintiff's asserted claim[]" that defendants have a preference for students over other classes of tenants. (Id. at 80).

In any event, defendants contend that with respect to RFP numbers 48 and 49 (seeking documents supporting defendants' statements that they have complied with all applicable restrictions on the Property as well as all local, State, and Federal housing requirements), they have produced their 2017, 2018, and 2019 compliance reporting to the City, as well as "all of the underlying tenant demographic data included within their rental application." (Id.). They state this represents all of the information they have available to demonstrate their compliance. (Id. at 80-81). They also note that the management agreements all reference the CC&Rs and property restrictions, and further clarify that the managers "would familiarize themselves and assist the Owners with fair housing compliance," thus satisfying defendants' discovery obligations to provide the documents within their possession, custody, or control. (Id. at 81). Defendants submit that they have "produced the criteria [they] used to evaluate all tenant applications" as the tenant files contain all of the information collected from the tenants during the application process, including any checklists and forms they were required to complete and submit, and any changes or modifications to those forms over time. (Id.).

With respect to RFP numbers 61-64 (TPG only) and Interrogatory numbers 15-16 (TPG only) (seeking information regarding the fully-satisfied 1998 Bond Agreement, or the CC&Rs, including defendants' communications with or regarding the City), defendants state that if they failed to comply with the CC&Rs, then it is the City that would have a cause of action for enforcement. (Id.). They again note that the demographic information plaintiff is seeking is in the tenant files, and includes the occupant's stated ages, income history, and racial backgrounds. (Id.). They conclude that their purported failure to comply with the CC&Rs "is not a facially neutral policy resulting in a disproportionate impact on protected classes," and "CC&R litigation is simply beyond the scope of Plaintiff's claims and standing." (Id. at 82 (citations omitted)). As such, "no further discovery should be ordered on issues related to Defendants' noncompliance with the CC&Rs or communications with the City of Pomona." (Id.).

The Court finds that although it may only be the City that has a cause of action for *enforcement* related to defendants' purported failure to comply with the CC&Rs, there is no indication that plaintiff is in any way seeking to enforce that compliance. Instead, plaintiff is seeking the requested information to help it determine whether defendants' actions resulted in disparate treatment or disparate impact under plaintiff's FHA and FEHA claims. In that respect, the Court finds that the information being sought is relevant and proportional to the needs of the case.

The Court also finds that it is not clear whether the documents defendants have thus far produced represent the entirety of the responsive documents in their possession, custody, or control. For instance, as stated throughout this Order, there is no indication whether defendants produced any ESI that has not already been produced in another format.

Based on the foregoing, plaintiff's Motion with respect to RFP numbers 48, 49, 61-64 (all TPG only), and Interrogatory numbers 15-16 (both TPG only) is **granted in part**. **No later than July 29, 2021**, defendants shall provide their supplemental responses and produce documents in their possession, custody, or control that are responsive to these requests, including, but not limited to, ESI that has not already been produced in another format, for the relevant time periods as stated in the requests, or since 2012 if not otherwise stated. Defendants are under no obligation to re-produce the tenant files in electronic format if the electronic files mirror the hard copies already provided to plaintiff for copying. If defendants contend that they have no additional documents, then **no later than July 29, 2021**, each defendant shall provide a **declaration, signed under penalty of perjury by a corporate representative**, attesting, if true, that after a diligent search and reasonable inquiry there are no additional documents responsive to RFP numbers 48, 49, 61-64 (all TPG only), in its possession, custody, or control, including, but not limited to, ESI that has not already been produced in another format, for the relevant time periods as stated in the requests, or since 2012 if not otherwise stated.

IT IS SO ORDERED.


cc:     Counsel of Record


Initials of Deputy Clerk _____ ch _____